# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Arena Development Group, LLC,
a California limited liability company;
and Ice Station Valencia, LLC, a
California limited liability company,

                Plaintiffs,

       v.

Naegele Communications, Inc, a
Minnesota Corporation; Robert O.
Naegele, Jr., a/k/a Robert Naegele, Jr.,
a/k/a R.O. Naegele, Jr., a/k/a R. Naegele,
Jr., a/k/a O. Naegele, Jr., a/k/a Bob Naegele,
Jr., a/k/a Robert O. Naegele, a/k/a Robert
Naegele, a/k/a R.O. Naegele, a/k/a R.
Naegele, a/k/a O. Naegele, a/k/a Bob
Naegele, an individual; Premier Rinks, Inc.,
f/k/a Premier Rinks, LLC, a Minnesota
limited liability company; RNDB, Inc., d/b/a
BNDB, Inc., f/k/a Athletica, Inc., d/b/a
Crystaplex Ice Rink Systems, f/k/a In-Line
Sports Systems, Inc., d/b/a Border Patrol, a
Minnesota Corporation; Robert O. Naegele
III, a/k/a Robert Naegele III, a/k/a R.O.
Naegele III, a/k/a R. Naegele III, a/k/a O.
Naegele III, a/k/a Bob Naegele III, a/k/a
Robert O. Naegele, a/k/a Robert Naegele,
a/k/a R.O. Naegele, a/k/a R. Naegele, a/k/a
O. Naegele, a/k/a Bob Naegele, an individual;
and David B. Battel, a/k/a David Battel, a/k/a
D. B. Battel, a/k/a D. Battel, a/k/a B. Battel,
an individual,

                Defendants.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 06-2806 ADM/AJB

---

Franklin R. Fraley, Jr., Esq., Fraley & Associates, Los Angeles, CA, and Joseph L. Steinfeld, Jr., Esq., ASK Financial LLP, Eagan, MN, on behalf of Plaintiffs.

John R. McDonald, Esq. and Daniel J. Supalla, Esq., Briggs & Morgan, P.A., Minneapolis, MN, on behalf of the Non-Athletica Defendants; and Gordon H. Hansmeier, Esq. and Kristi D. Stanislawski, Esq., Rajkowski Hansmeier Ltd., St. Cloud, MN, on behalf of the Athletica Defendants.

---

# I. INTRODUCTION

On June 5, 2007, oral argument before the undersigned United States District Judge was heard on Defendants Robert O. Naegele, Jr. ("Naegele Jr."), Naegele Communications, Inc. ("NCI"), and Premier Rinks, Inc.'s ("Premier") (collectively, the "Non-Athletica Defendants") Motion to Dismiss [Docket No. 47].  Robert O. Naegele III ("Naegele III"), RNDB, Inc. ("Athletica"), and David Battel ("Battel") (collectively, the "Athletica Defendants") have not filed a separate motion to dismiss, but have filed a Memorandum [Docket No. 53] in support of the Non-Athletica Defendants' Motion to Dismiss.  In their Second Amended Complaint [Docket No. 43], Plaintiffs Arena Development Group, LLC ("Arena") and Ice Station Valencia, LLC ("Ice Station") (collectively "Plaintiffs") have asserted two claims for declaratory relief for recharacterization of debt as equity and equitable subordination, four claims for fraudulent transfer, and claims for conversion, enforcement of judgment, unjust enrichment, and breach of fiduciary duty.  Plaintiffs also ask for the Athletica Defendants' Memorandum to be stricken. For the reasons set forth herein, the Non-Athletica Defendants' Motion to Dismiss is granted in part and denied in part, and Plaintiffs' request to strike the Athletica Defendants' Memorandum is denied as moot.

# II. BACKGROUND

NCI is a privately held corporation engaged in the management of investments for the Naegele family.  2d Am. Compl. ¶ 39.  Naegele Jr. is the chairman of the board of directors of NCI and holds a controlling equity interest in NCI.  Id. ¶¶ 40-41.  Naegele III, Naegele Jr.'s son, also holds an equity interest in NCI.  Id. ¶¶ 38, 43.  Naegele Jr. and Naegele III have equity interests in the Minnesota Wild, Minnesota's professional hockey team.  Id. ¶¶ 46-52.

In 1993, Naegele III founded In-Line Sports Systems, Inc., using the trade name Border

Patrol. <u>Id.</u> ¶ 12.  In 1998, Border Patrol's name was changed to Athletica.  <u>Id.</u> ¶ 57.  Throughout

Athletica's existence, Naegele III was a shareholder, chairman of the board of directors, a

director, and an officer of Athletica.  <u>Id.</u> ¶ 14.  In 1997, Naegele III invited Battel to become a

shareholder, director, and officer of Athletica.  <u>Id.</u> ¶ 33.  Naegele Jr. was also allegedly an insider

of Athletica.  <u>Id.</u> ¶ 45.  From 1993 until 1999, Athletica manufactured and sold portable or

temporary roller hockey rinks, and equipment and accessories for portable or temporary roller

hockey rinks.  <u>Id.</u> ¶ 16.  In 1998, Naegele Jr., Naegele III, and Battel decided to reorganize

Athletica to expand its business to the manufacture and distribution of ice rinks, and equipment

and accessories for ice arenas.  <u>Id.</u> ¶ 56.  On January 8, 1999, Athletica acquired Crystaplex Ice

Rink Systems ("Crystaplex"), an existing manufacturer and distributor of ice rinks, and

equipment and accessories for ice arenas.  <u>Id.</u> ¶¶ 58, 87.  Athletica sold and installed a flooring

product for use in off-ice areas of ice rinks.  <u>Id.</u> ¶ 161.

Plaintiffs aver that from its inception, Naegele III failed to adequately capitalize

Athletica.  <u>Id.</u> ¶ 17.  From 1998 through 2002, Athletica had an uninterrupted pattern of annual

net losses.  <u>Id.</u> ¶ 18.  Plaintiffs allege that as of 1998, Athletica was "Bankruptcy Insolvent,"

meaning that the sum of Athletica's debts was greater than the sum of Athletica's assets at fair

valuation.  <u>Id.</u> ¶ 21.  Plaintiffs further allege that as of 1998, Athletica was completely dependent

on capital infusions to continue to operate and therefore was not a going concern.  <u>Id.</u> ¶ 23.

Plaintiffs also allege that as of 1999, Athletica became "Balance Sheet Insolvent," meaning that

the sum of Athletica's debts was greater than the sum of Athletica's assets at book value.  <u>Id.</u> ¶

27.  Athletica continued to be Bankruptcy Insolvent, Balance Sheet Insolvent, and not a going

concern, through 2001.  <u>Id.</u> ¶¶ 90-92, 123-25.

On January 5, 1999, NCI and Athletica entered into a "Revolving Credit Agreement," in

which NCI loaned Athletica $2,000,000, and Athletica gave NCI a security interest in

substantially all of its assets.  Id. ¶¶ 66-67.  The terms of the Revolving Credit Agreement provided that Athletica's insolvency would be an automatic default on the loan.  Id. ¶ 70. Plaintiffs aver that Naegele Jr., Naegele III, Battel, Athletica, and NCI all knew or should have known that Athletica was Bankruptcy Insolvent and almost Balance Sheet Insolvent at the time of the loan.  Id. ¶¶ 69, 71-72.  Athletica was immediately and automatically in default on the loan.  Id. ¶ 73.  On October 20, 1999, NCI and Athletica amended the Revolving Credit Agreement to increase the principal amount of the loan by $300,000.  Id. ¶ 97.  On April 1, 2001, NCI and Athletica again amended the Revolving Credit Agreement to increase the principal amount of the loan by an additional $1,675,000, raising the total principal amount of the loan to $3,975,000.  Id. ¶ 133.  Athletica continued to be in automatic default on the loan during the first and second amendment to the loan.  Id. ¶¶ 102, 138.  Plaintiffs allege that due to Athletica's default on the loan, the first and second amendments never took effect and were never secured against Athletica's assets.  Id. ¶¶ 106-07, 142-43.  Athletica never made any payments of principal or interest on the loan.  Id. ¶¶ 89, 122, 158-59.

Plaintiffs allege that at the time of the loan and the amendments to the loan, "Athletica could not obtain credit from lenders in an arm's length transaction, but only from an insider who was either in control of Athletica or a relative of a general partner, director, officer, or other person in control of Athletica."  Id. ¶¶ 75, 109, 145.  Plaintiffs also allege that Naegele Jr. and NCI did not expect Athletica to repay the loans unless and until Athletica generated a net profit. Id. ¶¶ 77, 111, 147.  Plaintiffs further allege that the loan functioned as a conduit for Naegele Jr. to make an undisclosed capital investment.  The investment was disguised as a loan to prevent creditors from being able to reach the funds of Athletica.  Id. ¶¶ 78, 83-84, 112, 117-18, 148, 153-54.  Plaintiffs argue that Naegele III, Naegele Jr., Battel, NCI, and Athletica had no legitimate business purpose for the loans, but the loans provided Athletica with cash enabling

4

Athletica to appear to its customers to be a solvent business.  Id. ¶¶ 81, 115, 151.  Plaintiffs allege that Naegele Jr. and NCI never intended to enforce the terms of the loans unless and until a creditor sought to satisfy claims against Athletica.  Id. ¶¶ 86, 120, 156.

In 2000, Arena was constructing an ice skating and family entertainment facility in Valencia, California, for Ice Station.  Id. ¶ 164.  On June 30, 2000, Arena entered into a contract for $216,733, for which Athletica was to supply and install the flooring in the Ice Station facility.  Id. ¶ 167.  Arena paid $171,193.93 to Athletica on the flooring contract before Athletica breached the flooring contract.  Id. ¶¶ 174-75.  In 2004, an arbitrator awarded Arena $1,000,652.20 in damages, attorneys' fees, expenses, and costs.  Id. ¶ 176.  In February 2006, a California state court entered judgment in favor of Arena and against Athletica on the arbitration award in the amount of $1,214,394.98, and in favor of Ice Station and against Athletica on default prove-up in the amount of $587,118.03.  Id. ¶ 177.

In March 2004, Plaintiffs allege that Naegele III and Battel threatened Jerrold Fine, the manager of Arena, that NCI would foreclose the loan on substantially all of Athletica's assets if Arena tried to collect the arbitration award, leaving Athletica with no means to pay its creditors.  Id. ¶¶ 163, 179.  In April 2004, NCI formed Premier and transferred the Athletica loan to Premier.  Id. ¶¶ 180-81.  On April 30, 2004, Premier foreclosed NCI's security interest under the loan on substantially all of Athletica's assets.  Id. ¶ 182.  After the foreclosure, Premier operated Athletica's business as Athletica.  Id. ¶ 183.  Plaintiffs allege that NCI never required Athletica to comply with any of the terms of the loan prior to the foreclosure, and that NCI used the foreclosure as a collusive device to enable Athletica to continue to operate but avoid paying the arbitration award and judgment.  Id. ¶¶ 184-85.

# III. DISCUSSION

## A.    Motion to Dismiss Standard

Rule 12 of the Federal Rules of Civil Procedure provides that a party may move to dismiss a complaint for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  In considering a motion to dismiss, the pleadings are construed in the light most favorable to the nonmoving party, and the facts alleged in the complaint must be taken as true. Hamm v. Groose, 15 F.3d 110, 112 (8th Cir. 1994); Ossman v. Diana Corp., 825 F. Supp. 870, 879-80 (D. Minn. 1993).  Any ambiguities concerning the sufficiency of the claims must be resolved in favor of the nonmoving party.  Ossman, 825 F. Supp. at 880.  "A motion to dismiss should be granted as a practical matter . . . only in the unusual case in which the plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief."  Frey v. City of Herculaneum, 44 F.3d 667, 671 (8th Cir. 1995).

## B.    Claims Against Naegele Jr.

The Non-Athletica Defendants argue that all claims against Naegele Jr. in his individual capacity should be dismissed.  They argue that Naegele Jr. acted only on behalf of corporations, not on his own behalf, and that Plaintiffs have failed to make any corporate veil-piercing allegations.  Plaintiffs argue that no veil-piercing allegations are necessary because Naegele Jr. is individually liable under other theories.[1]  Plaintiffs argue that Naegele Jr. is personally liable as a principal for the acts of his agent Athletica, for committing the tort of fraudulent transfer, for participating in a conspiracy of fraudulent transfers, for aiding and abetting fraudulent transfers, for being a transfer beneficiary, and for breach of fiduciary duty.

---

[1] Because Plaintiffs expressly disavow reliance on a corporate veil piercing theory, no corporate veil piercing arguments will be addressed.  Pls.' Opp'n Mem. [Docket No. 55] at 20-21.

### 1.    Agency Theory

In paragraph 62 of their Second Amended Complaint, Plaintiffs allege that Athletica was the agent of Naegele Jr.  Plaintiffs then argue that as a principal of Athletica, Naegele Jr. bears personal responsibility for Athletica's acts.  In support of their agency theory, Plaintiffs rely on A. Gay Jenson Farms Co. v. Cargill, Incorporated, 309 N.W.2d 285 (Minn. 1981).  However, Cargill does not support Plaintiffs' theory.  Cargill does not present a situation where an individual was held to be the principal of a corporation.  Plaintiffs argue that Naegele Jr. assumed significant control over the financial affairs of Athletica, which created the principal/agent relationship.  See 2d Am. Compl. ¶ 45.  However, beyond the allegation that NCI provided money to Athletica, Plaintiffs fail to allege any facts showing how Naegele Jr. controlled Athletica.  As the Supreme Court recently stated in Bell Atlantic Corporation v. Twombly, 127 S. Ct. 1955, 1964-65 (2007) (internal citations omitted),

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the "grounds" of his "entitlement to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.  Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

Plaintiffs have failed to allege facts to support that Naegele Jr. was Athletica's principal, or provide precedential legal support for their agency theory.  Accordingly, Naegele Jr. can not be held personally liable on an agency theory.

### 2.    Tort Theory

Plaintiffs also argue that Naegele Jr. incurred personal liability by committing the tort of fraudulent transfer.  In support of their argument that corporate agents are personally liable for tortious conduct, Plaintiffs cite cases that are factually distinguishable from the instant case, and that do not involve fraudulent transfer.  See, e.g., State v. McBride, 9 N.W.2d 416, 420 (Minn.

1943) (corporate president convicted of selling intoxicating liquor without a license).  Also, a review of cases from other jurisdictions cited by both Plaintiffs and the Non-Athletica Defendants reveal that there is considerable debate as to whether fraudulent transfer is a tort at all.  Compare In re Sverica Acquisition Corp., 179 B.R. 457, 469 (Bankr. E.D. Pa. 1995) (finding that a fraudulent conveyance is more akin to a tort than a contract) with F.D.I.C. v. S. Prawer & Co., 829 F. Supp. 453, 455-56 (D. Me. 1993) (violation of Maine's Uniform Fraudulent Transfers Act ("UFTA") is not a tort).  Further, Plaintiffs rely on DFS Secured Healthcare Receivables Trust v. Caregivers Great Lakes, Inc., 384 F.3d 338, 349 (7th Cir. 2004), where the Seventh Circuit certified to the Indiana Supreme Court the question "whether an officer or director of a first transferee under the IUFTA who is found to have personally participated in the fraud can be held personally liable under Indiana law on that basis alone."  In Caregivers, the Seventh Circuit recognized that under Indiana state law, an officer or shareholder of a corporation can be held individually liable, absent veil piercing, if he personally participates in fraud.  384 F.3d at 346.  The court further noted that although Indiana's common law fraud rule had never been applied in the UFTA context, it reasonably could apply because (1) Indiana treats claims under the UFTA as a type of fraud claim, (2) the UFTA expressly incorporates principles of common law fraud by reference, and (3) at least one other court has reached a similar conclusion in a similar context.  Id. at 347; see Firstar Bank, N.A. v. Faul, No. 00-C-4061, 2001 WL 1636430, at *7 (N.D. Ill. Dec. 20, 2001).  The Seventh Circuit also noted that at least one other state with a similar common law fraud rule declined to hold liable under the UFTA an officer who personally participated in fraud.  Id. at 347-48; see Rohm & Haas Co. v. Capuano, 301 F. Supp. 2d 156, 160-61 (D.R.I. 2004) (declining to extend the reach of fraudulent conveyance actions so as to include parties that are only participants in a fraudulent transfer).

Plaintiffs' theory of liability is creative, however, the Court finds it too tenuous to be a

viable theory of individual liability.  Again, Plaintiffs do not allege that Naegele Jr. was a director, officer, or shareholder of Athletica, but that he was an "insider."  See 2d Am. Compl. ¶ 45.  The Complaint is devoid of allegations as to how Naegele Jr. controlled Athletica.  To allow a claim for personal liability on Plaintiffs' tort-theory basis given the uncertain status of a fraudulent transfer claim as a tort, contract, or something in between is without factual or legal support.

### 3.    Conspiracy and Aiding and Abetting Theories

In the Second Amended Complaint, Plaintiffs argue Naegele Jr. is liable as a co-conspirator or an aider and abettor of alleged fraudulent transfers.  2d Am. Compl. ¶¶ 206, 217, 228, 239.  The Non-Athletica Defendants argue that there is no fraudulent transfer liability for non-transferees, regardless of the theory alleged, and despite bare allegations in the Second Amended Complaint to the contrary, Naegele Jr. was not a subsequent transferee.  Plaintiffs respond that established Minnesota common law supports liability for those who knowingly conspire to commit, or aid and abet, torts, and that conspiracy or aiding and abetting liability for fraudulent transfers can apply to a non-transferee.  Both parties cite case law from other jurisdictions to support their positions.

In general, courts have declined to impose liability on non-transferees based on conspiracy and aiding and abetting theories.  See, e.g., Chepstow Ltd. v. Hunt, 381 F.3d 1077, 1088-89 (11th Cir. 2004) (stating nothing in the language of the statute creates an independent cause of action for aiding and abetting liability); S. Prawer & Co., 829 F. Supp. at 456-57 (stating violation of UFTA is not a tort, therefore, no liability for conspiracy or aiding and abetting); Ernst & Young LLP v. Baker O'Neal Holdings, Inc., No. 1:03-CV-0132-DFH, 2004 WL 771230, at *14 (S.D. Ind. Mar. 24, 2004) (stating "there is no accessory liability for fraudulent transfers under the Uniform Fraudulent Transfer Act," and citing cases).

The Court finds the reasoning of these cases to be persuasive.  A review of the Minnesota UFTA reveals no provisions expressly imposing liability for conspiracy to commit or aiding and abetting a violation of the UFTA.  In addition, as previously stated, whether a fraudulent transfer under the UFTA is a tort is uncertain.  Accordingly, Naegele Jr. can not be held personally liable for aiding and abetting or conspiring to commit a violation of the UFTA.

### 4.    Person for Whose Benefit the Transfer was Made

Plaintiffs argue that Naegele Jr. incurred personal liability despite being a non-transferee because Athletica made the transfers for Naegele Jr.'s benefit.  The Minnesota UFTA states that a judgment may be entered against "the person for whose benefit the transfer was made," in addition to first transferees and subsequent transferees.  Minn. Stat. § 513.48(b)(1), (2).  To support their argument, Plaintiffs rely on Qwest Communications Corp. v. Weisz, 278 F. Supp. 2d 1188, 1191 (S.D. Cal. 2003), where a court found that the plain language of California's UFTA, which includes the language "the person for whose benefit the transfer was made," does not limit recovery to debtors and transferees, but may include a shareholder of a corporation who benefits from the transfer.  The Non-Athletica Defendants argue that Plaintiffs' allegations are too conclusory and fail to allege that Naegele Jr. received any particular benefit or was the intended beneficiary of any transfer.

Plaintiffs' Second Amended Complaint alleges that Naegele Jr. is liable for fraudulent transfer as a subsequent transferee, constructive trustee, co-conspirator, or aider and abetter.  2d Am. Compl. ¶¶ 205-06, 216-17, 227-28, 238-39.  However, Plaintiffs never allege Naegele Jr. is the "person for whose benefit the transfer was made," and also have not specified what the benefit was or whether the benefit was received.  Also, Plaintiffs' more specific allegations reveal that Naegele Jr. was not a subsequent transferee.  See id. ¶¶ 133-38, 181-83. Consequently, Naegele Jr. can not be held personally liable on the basis that he is "the person for

10

whose benefit the transfer was made."

### 5.    Breach of Fiduciary Duty

In their tenth claim, Plaintiffs allege that by virtue of Athletica's insolvency and Naegele Jr.'s position as an insider of Athletica who controlled the financial decisions of Athletica, Naegele Jr. entered into a fiduciary relationship with Athletica's creditors.  Id. ¶ 268.  Plaintiffs allege Naegele Jr. owed fiduciary duties to Athletica's creditors, including duties of disclosure, of preference, and to account, and that Naegele Jr. breached his fiduciary duties to Plaintiffs by failing to disclose that Athletica was insolvent.  Id. ¶¶ 269, 273.

The Non-Athletica Defendants argue Plaintiffs' fiduciary duty theory fails because Plaintiffs do not allege that Naegele Jr. was an officer or director of Athletica.  Further, officers and directors of insolvent corporations do not generally owe fiduciary duties to creditors beyond the prohibition against self-dealing or preferential treatment.  The Minnesota Supreme Court has stated:

> When a corporation is insolvent, or on the verge of insolvency, its directors and officers become fiduciaries of the corporate assets for the benefit of creditors.  As fiduciaries, they cannot by reason of their special position treat themselves to a preference over other creditors.  By "preference," we here mean generally a transfer or encumbrance of corporate assets made while the corporation is insolvent or verges on insolvency, the effect of which is to enable the director or officer to recover a greater percentage of his debt than general creditors of the corporation with otherwise similarly secured interests.

Snyder Elec. Co. v. Fleming, 305 N.W.2d 863, 869 (Minn. 1981) (internal citations omitted). Minnesota courts have declined to extend the duty to preserve and protect the assets of the corporation beyond the prohibition against self-dealing or preferential treatment.  See St. James Capital Corp. v. Pallet Recycling Assocs. of N. Am., Inc., 589 N.W.2d 511, 514-16 (Minn. Ct. App. 1999).

Plaintiffs' breach of fiduciary duty claim against Naegele Jr. must be dismissed.  A duty is imputed to individuals who are directors, shareholders, or officers, not merely "insiders" as

Plaintiffs have here alleged.  Plaintiffs do not make sufficient allegations that Naegele Jr.

engaged in preferential treatment or self-dealing at the expense of other creditors, and the Court

declines to impose a generalized fiduciary duty beyond the prohibition against self-dealing or

preferential treatment.

In sum, Plaintiffs have failed to allege viable theories of individual liability and have

failed to make sufficient allegations to support individual liability for Naegele Jr.  Accordingly,

all claims against Naegele Jr. are dismissed.

**C.     Recharacterizing Debt as Equity and Equitable Subordination**

The first two claims in Plaintiffs' Second Amended Complaint request declaratory relief

for recharacterization of debt as equity and equitable subordination.  2d Am. Compl. ¶¶ 186-98.

The Non-Athletica Defendants argue that Plaintiffs' recharacterization and equitable

subordination claims are requests for remedies untethered to any legal cause of action, and are

therefore not cognizable.  The Non-Athletica Defendants contend that federal district courts do

not have the power to restructure debts outside of the bankruptcy context.  Plaintiffs respond that

their recharacterization and equitable subordination claims are cognizable as requests for

declaratory relief.

Plaintiffs fail to provide any precedent for a district court to grant declaratory relief in the

form of recharacterization of debt as equity or equitable subordination.  However, Plaintiffs have

cited two Minnesota cases where equitable subordination was at least considered—and in one

instance, applied—outside of the bankruptcy context.  Ripley v. Piehl, 700 N.W.2d 540, 548

(Minn. Ct. App. 2005) (holding district court did not abuse its discretion in failing to apply

equitable subordination after finding no evidence of fraud or deception); Hughes v. Stroebel, No.

C0-94-2664, 1995 WL 538646, at *2 (Minn. Ct. App. Sept. 12, 1995) (holding trial court did not

err in applying equitable subordination).

On the other hand, the Non-Athletica Defendants rely on several cases for the proposition that recharacterization of debt as equity and equitable subordination are unique powers of bankruptcy courts.  See, e.g., In re Racing Servs., Inc., 340 B.R. 73, 76 (B.A.P. 8th Cir. 2006) ("A bankruptcy court may, under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim.  Equitable subordination was originally a judicially created remedy which was incorporated into the Bankruptcy Code in 1978.") (internal citation omitted); HBE Leasing Corp. v. Frank, 48 F.3d 623, 634 (2d Cir. 1995) ("The doctrine of equitable subordination, however, simply does not apply to state-law fraudulent conveyance claims.  Equitable subordination is distinctly a power of federal bankruptcy courts, as courts of equity, to subordinate the claims of one creditor to those of others."); see also In re Hoffinger Indus., Inc., 327 B.R. 389, 408 (Bankr. E.D. Ark. 2005) (discussing how the power of bankruptcy courts to recharacterize a loan from debt to equity stems from the courts' general equitable powers contained in the bankruptcy code).

Plaintiffs' claims for declaratory judgment relief for recharacterization of debt to equity and equitable subordination are dismissed.   Declaratory relief for recharacterization of debt to equity and equitable subordination are not cognizable causes of action in federal district court.

**D.    Fraudulent Transfer[2]**

   **1.    Actual Fraud - Particularity**

---

   [2] The Non-Athletica Defendants raise some arguments with respect to Plaintiffs' fraudulent transfer claims for the first time in their reply brief.  Reply Br. [Docket No. 58] at 6 (transfers pursuant to second and third credit agreement excused by Minn. Stat. § 513.48(f)(3)), 6-8 (foreclosure was not a "transfer"), 8-9 (insufficient badges of fraud).  Because Plaintiffs did not have a fair opportunity to respond to these arguments, the Court declines to address them. See Travel Tags, Inc. v. Performance Printing Corp., Civ. No. 06-2970, 2007 WL 2122662, at *7 (D. Minn. July 19, 2007); Black v. Indep. Sch. Dist. No. 316, 476 F. Supp. 2d 1115, 1121 n.6 (D. Minn. 2007).  If appropriate, the Non-Athletica Defendants may raise these arguments at summary judgment.

Claims three and four of Plaintiffs' Second Amended Complaint allege claims for Fraudulent Transfer—Actual Fraudulent Intent.  2d Am. Compl. ¶¶ 199-220.  The Non-Athletica Defendants argue that claims three and four should be dismissed for failure to plead fraud with specificity under Rule 9(b) of the Federal Rules of Civil Procedure.  Specifically, the Non-Athletica Defendants argue Plaintiffs' allegations contravene Rule 9(b) because the allegations group all the Defendants together as wrongdoers without setting forth with specificity the respective roles of the Defendants in the alleged frauds.  Plaintiffs respond that they have pled their allegations of fraud with particularity, and any allegations not pled with particularity concern facts known only to Defendants, which can not be set forth without discovery.

Specifically, Rule 9(b) states: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.  Malice, intent, knowledge, and other condition of mind of a person may be averred generally."  The Eighth Circuit has stated that:

> "Circumstances" include such matters as the time, place and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby.  Because one of the main purposes of the rule is to facilitate a defendant's ability to respond and to prepare a defense to charges of fraud, conclusory allegations that a defendant's conduct was fraudulent and deceptive are not sufficient to satisfy the rule.

Commercial Prop. Invs., Inc. v. Quality Inns Int'l, Inc., 61 F.3d 639, 644 (8th Cir. 1995).  "Put another way, the complaint must identify the 'who, what, where, when, and how' of the alleged fraud."  United States v. St. Luke's Hosp., Inc., 441 F.3d 552, 556 (8th Cir. 2006) (citations omitted).  The Court has reviewed the many allegations in Plaintiffs' Second Amended Complaint, which is over eighty pages in length, and is satisfied that they meet the requirements of Rule 9(b).  Accordingly, Plaintiffs' second and third claims are not dismissed on the basis of failure to plead fraud with specificity.

14

## 2.      Constructive Fraud

Claims five and six of Plaintiffs' Second Amended Complaint allege claims for

Fraudulent Transfer—Constructive Fraudulent Intent.  2d Am. Compl. ¶¶ 221-42.  Minn. Stat. §

513.45 provides:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

> (b) A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

### a.      Reasonably Equivalent Value

The Non-Athletica Defendants argue that Plaintiffs have alleged no facts to support the

conclusion that Athletica did not receive "reasonably equivalent value" in exchange for the

security interest it granted NCI, and that Plaintiffs do not allege that NCI did not loan money to

Athletica.  Plaintiffs respond that they have set forth sufficient allegations that Athletica did not

receive reasonably equivalent value because they allege that the loan was not a loan at all but

rather a device for NCI to make an equity investment in Athletica.  Plaintiffs also deny alleging

the Non-Athletica Defendants actually provided cash to Athletica, or that any cash or anything

else provided by the Non-Athletica Defendants to Athletica was reasonably equivalent value for

Athletica's transfer of its assets.  Plaintiffs do argue that Athletica received nothing when

Premier foreclosed on Athletica's assets.

In paragraphs 223 and 234 of the Second Amended Complaint, Plaintiffs allege that

Athletica did not receive reasonably equivalent value in exchange for the transfer of an interest

in its assets "because the Purported Loan was not, in fact, a loan, but instead an equity

investment in Athletica in exchange for which Athletica improperly granted a security interest in substantially all of Athletica's assets . . . ."  Although recharacterizing debt as equity fails as a basis for seeking declaratory relief, the Court will allow discovery to proceed on whether a "disguised" loan may be the predicate basis for a fraudulent transfer.  Plaintiffs have sufficiently alleged the "reasonably equivalent value" element.

### b.    Timing

The Non-Athletica Defendants next argue that the first and second credit agreements can not be fraudulent as to Plaintiffs because Plaintiffs were not creditors whose claims arose before those transfers were made.  Plaintiffs do not disagree with the Non-Athletica Defendants' argument, but instead aver that they were creditors of Athletica at the time of the third credit agreement and Premier's foreclosure on Athletica's assets, thus satisfying the "creditor whose claim arose before the transfer was made" element.  Essentially, both parties are right.  Plaintiffs were not creditors of Athletica at the time of the initial Revolving Credit Agreement and the first amendment to the Revolving Credit Agreement, and so the first two transfers can not be fraudulent as to Plaintiffs.  However, Plaintiffs were creditors of Athletica at the time of the second amendment to the Revolving Credit Agreement and the foreclosure.  Plaintiffs' constructive fraud claims based on the third credit agreement and the foreclosure will remain for discovery.[3]

### c.    Antecedent Debt

The Non-Athletica Defendants argue that Plaintiffs have made no allegations that the loan was "to an insider for an antecedent debt."  The Non-Athletica Defendants argue that

---

[3] In light of the Court's ruling on this issue, there is no need to discuss the Non-Athletica Defendants' arguments with respect to whether Athletica was solvent at the time of the first credit agreement.  Defs.' Mem. of Law [Docket No. 49] at 24-25.

Plaintiffs do not allege that NCI or Athletica had any pre-existing debtor-creditor relationship. Plaintiffs respond that it can be inferred from their Second Amended Complaint that Athletica's transfer of security interests in exchange for the first and second amendment to the loan were for antecedent debts. Plaintiffs also argue that the foreclosure involved a transfer for an antecedent debt because the foreclosure was conducted pursuant to the previous loans, which constitute an antecedent debt.

A review of Plaintiffs' Second Amended Complaint reveals that Plaintiffs have made no allegations with respect to whether any of the transfers were made "to an insider for an antecedent debt" other than parroting the language of the statute. Accordingly, claims five and six of Plaintiffs' Second Amended Complaint, based on Minn. Stat. § 513.45(b), are dismissed.

### d.    Enforcement of a Security Interest

Minn. Stat. § 513.48(e)(2) states: "A transfer is not voidable under section 513.44(a)(2) or 513.45 if the transfer results from . . . enforcement of a security interest in compliance with article 9 of the Uniform Commercial Code." In footnotes, the Non-Athletica Defendants argue the alleged fraudulent transfers qualify for this immunity. Defs.' Mem. of Law at 22 n.15, 24 n.16. While Minn. Stat. § 513.48(e)(2) might provide a possible defense for the Non-Athletica Defendants, applying it now would require the Court to disregard the allegations in Plaintiffs' Second Amended Complaint. This issue may be raised again in a summary judgment context.

### E.    Conversion

For their seventh claim for relief, Plaintiffs allege a claim for conversion. 2d Am. Compl. ¶¶ 243-51. Conversion is "an act of willful interference with the personal property of another that is without justification or that is inconsistent with the rights of the person entitled to the use, possession or ownership of the property." Sec. Sav. Bank v. Green Tree Acceptance, Inc., 739 F. Supp. 1342, 1350 (D. Minn. 1990). The Non-Athletica Defendants argue that

Plaintiffs cannot succeed on their conversion claim because NCI took a security interest in Athletica's assets in January 1999 but Plaintiffs did not obtain a judgment against Athletica until 2006, meaning NCI has a superior right to Athletica's assets by the principle of first in time, first in right. The Non-Athletica Defendants argue that Plaintiffs can not sustain a claim that the Non-Athletica Defendants interfered with Plaintiffs' inferior rights. The Non-Athletica Defendants also argue that Plaintiffs lack a possessory interest because they have not alleged that they have filed a certified copy of their foreign judgment in an appropriate Minnesota court, and that they have complied with the Uniform Enforcement of Foreign Judgments Act. Plaintiffs respond that the Non-Athletica Defendants' arguments miss the mark because if Plaintiffs succeed on their declaratory relief claims for recharacterization of debt as equity or equitable subordination, then they will have a superior right to Athletica's assets and their claim for conversion will be viable.

Because the declaratory relief claims for recharacterization of debt as equity and equitable subordination have been dismissed, Plaintiffs' conversion claim is also dismissed. NCI has a superior right to Athletica's assets by the principle of first in time, first in right, and Plaintiffs can not sustain a claim that the Non-Athletica Defendants interfered with Plaintiffs' inferior rights. See Host v. Host, 497 N.W.2d 617, 619 (Minn. Ct. App. 1993).

**F.      Enforcement of Judgment**

In their eighth claim for relief, Plaintiffs allege a claim for enforcement of judgment. 2d Am. Compl. ¶¶ 252-59. The Non-Athletica Defendants argue that this claim must fail because Plaintiffs do not allege that the Non-Athletica Defendants were parties to the arbitration award or the California judgment, and the Non-Athletica Defendants can not be bound by a judgment in personam in a litigation in which they were not parties. Plaintiffs respond, without citation to any legal authority, that they do not seek to enforce the judgment against the Non-Athletica

Defendants in personam for the full amount due but in rem for the value of Athletica's assets.

This claim is duplicative of other claims in Plaintiffs' Second Amended Complaint and Plaintiffs have provided no legal authority to support it as a separate ground for relief. Plaintiffs may not enforce a judgment against the Non-Athletica Defendants to which the Non-Athletica Defendants were not parties. See Parklane Hosiery Co. v. Shore, 439 U.S. 322, 327 n.7 (1979) ("It is a violation of due process for a judgment to be binding on a litigant who was not a party or a privy and therefore has never had an opportunity to be heard."). The enforcement of judgment claim is dismissed.

## G.     Unjust Enrichment

Plaintiffs allege a claim for unjust enrichment as their ninth claim for relief. 2d Am. Compl. ¶¶ 260-66. The Non-Athletica Defendants argue Plaintiffs' unjust enrichment claim is superfluous and must be dismissed because Plaintiffs have an adequate legal remedy and statutory standards for recovery for alleged fraudulent conveyances are contained in the UFTA. Plaintiffs respond that if their fraudulent transfer claims fail, they will not have an adequate remedy at law, making their unjust enrichment claim viable.

"In order to establish a claim for unjust enrichment, the claimant must show that another party knowingly received something of value to which he was not entitled, and that the circumstances are such that it would be unjust for that person to retain the benefit." Schumacher v. Schumacher, 627 N.W.2d 726, 729 (Minn. Ct. App. 2001). "It is well settled in Minnesota that one may not seek a remedy in equity when there is an adequate remedy at law." Southtown Plumbing, Inc. v. Har-Ned Lumber Co., 493 N.W.2d 137, 140 (Minn. Ct. App. 1992) (citing cases). "Relief under the theory of unjust enrichment is not available where there is an adequate legal remedy or where statutory standards for recovery are set by the legislature." Id.

Plaintiffs' claim for unjust enrichment is dismissed. The UFTA provides Plaintiffs with

an adequate remedy at law, and contains statutory standards for recovery.

**H.     Objection to Athletica Defendants' Memorandum**

The Athletica Defendants have filed an Answer [Docket No. 45] to the Second Amended Complaint.  Nonetheless, the Athletica Defendants filed a Memorandum of Law [Docket No. 53] in support of the Non-Athletica Defendants' Motion to Dismiss the Second Amended Complaint. Plaintiffs object to and request the Court to strike [Docket No. 60] the Athletica Defendants' Memorandum of Law.  The Court did not consider the Athletica Defendants' Memorandum of Law in deciding the Non-Athletica Defendants' Motion to Dismiss.  Accordingly, Plaintiffs' request that the Court strike the Athletica Defendants' Memorandum of Law is denied as moot.

**IV. CONCLUSION**

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1. The Non-Athletica Defendants' Motion to Dismiss [Docket No. 47] is **GRANTED IN**

**PART AND DENIED IN PART**; and

2. Plaintiffs' Request to Strike [Docket No. 60] the Athletica Defendants' Memorandum

of Law is **DENIED AS MOOT**.

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  August 30, 2007.